IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

COURTNEY D. HENDERSON,
     Petitioner,

vs.                         Case No.:  3:17cv340/RV/EMT

MARK S. INCH,[1]
     Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 22).  Petitioner filed a reply (ECF No. 24).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

---

[1] Mark S. Inch succeeded Julie L. Jones as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d).

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 22).[2]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2010-CF-1567, with one count of home invasion robbery with a weapon (Count 1), one count of aggravated battery upon a person 65 years of age or older with great bodily harm or with a deadly weapon (Count 2), and one count of resisting an officer without violence (Count 3) (Ex. B).  Following a jury trial on August 8 and 10, 2011, Petitioner was found guilty of the lesser included offense of home invasion robbery without a weapon as to Count 1, guilty of the lesser included offense of battery upon a person 65 years of age or older as to Count 2, and guilty of resisting an officer without violence as charged as to Count 3 (Exs. I1, I2, J).  On September 9, 2011, the court sentenced Petitioner as a prison releasee re-offender to a mandatory term of thirty (30) years in prison on Count 1, with jail credit of 520 days, a concurrent term of five (5) years in prison on Count 2, and time served on Count 3 (Exs. K, L).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-05566 (*see* Exs. M, P).  The First

---

[2] Hereinafter all citations to the state court record refer to the exhibits submitted by Respondent (ECF No. 22).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

DCA affirmed the judgment per curiam without written opinion on August 29, 2013, with the mandate issuing December 5, 2013 (Exs. S, V). Henderson v. State, 145 So. 3d 100 (Fla. 1st DCA 2013) (Table).

On December 16, 2013, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D13-6216, alleging ineffective assistance of appellate counsel (Ex. W). Petitioner filed an amended petition with the initial petition (*see id.*). The First DCA considered the petition and amended petition collectively, and denied them on the merits on February 7, 2014 (Ex. Y). Henderson v. State, 132 So. 3d 365 (Fla. 1st DCA 2014) (Mem). Petitioner filed a motion for written opinion and a motion for rehearing (Exs. Z, AA). The First DCA denied each on April 9, 2014 (Ex. BB).

On August 13, 2014, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. CC). The state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within sixty (60) days (Ex. DD). Petitioner filed a timely amended motion (Ex. EE). On March 4, 2016, the circuit court held a limited evidentiary hearing on one of Petitioner's six claims (Exs. HH, II). The state circuit court denied the amended Rule 3.850 motion on July 19, 2016

(Ex. JJ).  The court denied Petitioner's motion for rehearing on January 18, 2017 (Ex.

MM).  Petitioner did not appeal the decision.

Petitioner filed the instant federal habeas action on May 10, 2017 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254.  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court explained the framework for § 2254 review

in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue presented in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *See* Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court holdings. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)]  does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.

*See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's holdings.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court.  Williams, 529 U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Harrington, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding. *See* Gill v. Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based

challenges to state court adjudications.  *See* <u>Cave v. Sec'y for Dep't of Corr.</u>, 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." <u>Gill</u>, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be." <u>Richter</u>, 562 U.S. at 102.

III.    EXHAUSTION

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. See Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally

---

[3]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
　　(A)   the applicant has exhausted the remedies available in the courts of the State; or
　　　　(B) (i)  there is an absence of available State corrective process; or
　　　　　(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state

court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[4]  *Id.*  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  *Id.*  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the

---

[4]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

Case No.:  3:17cv340/RV/EMT

conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." <u>Schlup</u>, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  *See* <u>McQuiggin v. Perkins</u>, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).  As the Court stated in <u>Schlup</u>, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; *see also* <u>House v. Bell</u>, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS

A.   Ground One:  "Whether the trial court erred in finding Mr. Henderson competent to stand trial."

Petitioner alleges he was prescribed "psyche drugs" during his childhood "because of his behavior as well as his ability to understand" (ECF No. 1 at 5). Petitioner alleges he was evaluated by Dr. James D. Larson on July 29 and 30, 2010, regarding his competency to proceed in the criminal case (*id.*).  Petitioner alleges Dr. Larson concluded he was only superficially cooperative and either malingering or grossly exaggerating his deficits (*id.*).  Petitioner alleges Dr. Larson concluded, "It is more likely than not he continues to remain competent as he proceeds at this time, as his performance today is malingered." (*id.*).   Petitioner alleges Dr. Larson recommended that defense counsel attempt to work with Petitioner as if he was competent, but suggested a re-evaluation if counsel became convinced that Petitioner was not competent (*id.*).

Petitioner alleges Dr. Lawrence T. Gilgun interviewed him on January 5 and 13, 2011, and concluded he was not competent (ECF No. 1 at 5–6).  Petitioner asserts the trial court found him competent to proceed without questioning Petitioner or making any findings as to whether he was mentally ill, whether he had the present ability to consult with counsel with a reasonable degree of rational understanding, or whether

he had a rational factual understanding of the proceedings against him (*id.* at 6). Petitioner states he presented this issue on direct appeal (*id.*).

Respondent appears to concede Petitioner exhausted this claim by presenting it as Issue I on direct appeal (ECF No. 22 at 17). Respondent contends the First DCA adjudicated the merits of the claim (*id.* at 17–20). Respondent contends Petitioner has failed to demonstrate the First DCA's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law, or that the adjudication rested upon an unreasonable determination of the facts (*id.* at 20–23).

1.    Clearly Established Federal Law

"[T]he conviction of an accused person while he is legally incompetent violates due process." Pate v. Robinson, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). The Supreme Court set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed 2d 824 (1960) (per curiam); Drope v. Missouri, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *see also* Indiana v. Edwards, 554 U.S. 164, 128 S.Ct. 2379, 171 L. Ed. 2d 345 (2008).

In <u>Drope</u>, the Court elaborated as follows:

> [t]he import of our decision in <u>Pate v. Robinson</u> is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

<u>Drope</u>, 420 U.S. at 180.

The Eleventh Circuit Court of Appeals has applied and expounded upon these standards. "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." <u>Medina v. Singletary</u>, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted). A <u>Pate</u> analysis must focus on "what the trial court did in light of what it then knew, whether objective facts known to the trial court were sufficient to raise a bona fide doubt as to the defendant's competency." <u>Fallada v. Dugger</u>, 819 F.2d 1564, 1568 (11th Cir. 1987). A petitioner who makes a substantive competency claim, contending that he was tried and convicted while mentally incompetent, "is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of

the evidence." James v. Singletary, 957 F.2d 1562, 1571 (11th Cir. 1992). This standard is in contrast to a petitioner who makes a procedural competency claim alleging that the trial court failed to hold a competency hearing after his competency was put at issue. To prevail on a procedural competency claim, "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." Id. at 1572 n. 15 (citing Fallada, 819 F.2d at 1568).

A lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to the defendant's competency at the time in question. See Medina, 59 F.3d at 1106; Card v. Singletary, 981 F.2d 481, 484 (11th Cir. 1992). Similarly, the fact that the accused is undergoing treatment with psychiatric drugs, while relevant, does not alone prove incompetence. See Sheley v. Singletary, 955 F.2d 1434, 1438–39 (11th Cir. 1992). In order to establish incompetence, evidence must establish that the drugs affected the accused to the point that he could not effectively consult with his attorney and could not understand the proceedings. See id. at 1439.

Furthermore, because legal competency is primarily a function of a defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect, so "the failure of defense counsel to raise the competency issue at trial, while not dispositive, is evidence that the defendant's competency was not really in doubt and there was no need for a Pate hearing." Watts v. Singletary, 87 F.3d 1282, 1288 (11th Cir. 1996); *see also* Adams v. Wainwright, 764 F.2d 1356, 1360 (11th Cir. 1985).

A presumption of correctness attaches to a state court's finding of competence. *See* Ferguson v. Sec'y for Dep't of Corr., 580 F.3d 1183, 1120–21 (11th Cir. 2009); Medina, 59 F.3d at 1106. A federal habeas court may ignore a state court's competency finding "only if the petitioner shows by clear and convincing evidence that the state court's determination was not fairly supported by the record." Turner v. Crosby, 339 F.3d 1247, 1273 (11th Cir. 2003) (internal quotation marks and citation omitted). "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." Turner, 339 F.3d at 1273 (quotation marks and citation omitted).

2.   Federal Review of State Court Decision

Petitioner presented this claim as Issue I on direct appeal (Ex. P at 22–24). Petitioner argued that the trial court failed to address all relevant facts and make requisite findings of fact to support the court's conclusion that Petitioner was competent to proceed (*id.*).  Petitioner argued the trial court (1) failed to review Dr. Larson's report before making a competency determination, (2) failed to resolve discrepancies between Dr. Larson's report and Dr. Gilgun's report and testimony, (3) failed to question Petitioner, and (4) failed to make findings as to whether Petitioner had a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and whether Petitioner had a rational as well as factual understanding of the proceedings against him (*id.*).   The First DCA affirmed Petitioner's conviction without written opinion (Ex. M).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due."  Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also* Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there

was no reasonable basis for the state court's decision. *See* <u>Harrington</u>, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* <u>Harrington</u>, 562 U.S. at 102; *see also* <u>Gill</u>, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The reports of Dr. Larson and Dr. Gilgun are part of the state court record (Exs. E, F). The following is a summary of those reports.

Dr. Larson conducted a mental status examination/psychological evaluation of Petitioner on July 29 and 30, 2010 (*see* Ex. E). Dr. Larson also reviewed Petitioner's legal records, prior psychological evaluations (on May 3, 2000 and March 5, 2009), and infirmary records from the local jail. Dr. Larson noted that the infirmary records indicated that Petitioner had not been identified as in need of mental health treatment during his incarceration. With respect to Petitioner's psychological history, Dr.

Larson noted that Petitioner "seemed to be a somewhat uncooperative and limited historian." (*id.*).  Dr. Larson noted the following with respect to Petitioner's mental status examination/psychological interview:

> The mental status examination revealed a male who, if he is to be believed, is not well oriented as to time.  I find this questionable, as he had been in court earlier that day.  When I asked him about what occurred in court, he stated he could not understand what "that dude behind the bench was saying."

> The Defendant disclaims hallucinations.  I did not elicit any delusions or other signs or symptoms of psychosis, such as bizarre behavior, agitation, mental confusion or a formal thought disorder.

> The Defendant was avoidant in making eye contact and frequently put his head down on the desk in the interviewing room.  His cooperation with the evaluation seemed to be superficial, and I would describe his behavior as passive-aggressive.

> Mood is reported as "depressed most of the time."  He disclaimed suicidal ideation or intent but reports a history of "several" prior suicide attempts.  Judgement appears to be mildly to moderately impaired.  Cognition appears below average.  For example, the Defendant had to think some time before he could recall the name of the President of the United States and, if he is to be believed, could not perform a simple change making problem.  He presented with very impaired memory processes on a three-item memory test.  In fact, his performance was so poor as to make the results questionable.

(Ex. E).

Dr. Larson administered psychological testing "[b]ecause the Defendant appeared to be either malingering or Mentally Retarded" (Ex. E).  Petitioner was

administered the Test of Malingering Memory ("TOMM"), which is designed to detect individuals who are exaggerating, feigning, or malingering memory impairments (*id.*). Petitioner scored 18 on the TOMM (*id.*). Dr. Larson noted:

> The Defendant's scores clearly are in the malingering range. The test is designed in such a way that random responding, or a hypothetical person with no memory at all would obtain a score of about 25. For him to get scores this low he had to know the correct responses and substitute incorrect ones.

(Ex. E).

Petitioner was administered the Wide Range Achievement Test-4, the scores of which are equivalent to IQ scores, except that they measure "achievement" rather than "ability" (Ex. E). Dr. Larson noted that since Petitioner's scores on the TOMM indicated he malingered memory impairments, the academic achievement scores were most likely invalid (*id.*). And because Petitioner malingered the TOMM, he was not administered the Wechsler Adult Intelligence Scale (*id.*).

Dr. Larson noted that his file included a previous evaluation of Petitioner on March 5, 2009 (sixteen months prior to the current evaluation) (Ex. E). Dr. Larson noted:

> At that time, he was able to give satisfactory definitions to the major participants in the judicial process and could define pertinent vocabulary terms. In all other ways, he presented as competent. At that time, I noted that although his intellect was Below Average, he did know the

name of the President of the United States and, unlike today, could perform a simple change making problem. As was true today, previously I found no psychotic symptoms such as hallucinations, delusions, or a formal thought disorder.

(Ex. E).

With respect to Petitioner's competency to proceed, Dr. Larson opined:

If the Defendant is to be believed, he did not know the meaning of burglary. However, he has a general understanding of why he was arrested and realizes be can receive prison time if convicted. He has a rational, as well as a factual, understanding of the proceedings against him.

The Defendant claimed not to understand anything about the nature of the adversarial process. For example, he stated that he had no idea what the Judge's job was. When asked who the boss in the courtroom was, he stated his Public Defender was. He did understand that his Public Defender's role is to "help me." However, he claimed not to know the role of the State Attorney, the meaning of prosecute, nor the meaning of convict. He claimed not to know most of the other terms pertinent in negotiating the judicial process, such as plea bargain, evidence, jury, bailiff, perjury, court reporter, or appeal. In fact, initially, he seemed confused about the difference between guilty and not guilty, but he eventually got it right.

He did know some terms such as sentence and probation. However, he claimed not to know the difference between a felony and a misdemeanor and claims not to know if he was charged with a felony.

(Ex. E).

Dr. Larson made the following recommendations:

While the Defendant has a history of mental health problems and Mental Retardation, he has previously been able to master Competency Instructional Training materials. I concluded that today he was only superficially cooperative with the evaluation and was malingering or grossly exaggerating his deficits. By inference, since I have evaluated him when he was clearly competent to proceed, I concluded that it is more likely than not he continues to remain competent as he proceeds at this time, as his performance today is malingered. (I cannot totally rule out memory decay of previously learned items, but given gross malingering, it is more reasonable to conclude he continues to have an adequate understanding of the nature of the adversarial process.)

I also found he was quite passive-aggressive today. He is a difficult client for you to deal with. However, I think this is a function of a Personality Disorder and the fact that he is angry about being incarcerated and is not adjusting well to incarceration.

My recommendation is that you attempt to work with him as if he is competent. Should you become convinced that he is not competent, a reevaluation may be in order. Although we could not obtain valid IQ scores today, he does have childhood IQ scores placing him in the Mentally Retarded range.

The remedy, should this occur, would be to place him in Competency Instructional Training classes, or, alternatively, commit him to the Agency for Persons With Disabilities, where he could go through a program such as Florida State Hospital's Mentally Retarded Defendant's Program.

(Ex. E).

Dr. Gilgun evaluated Petitioner on January 5 and 13, 2011 (Ex. F). Dr. Gilgun also reviewed Petitioner's arrest report, Dr. Larson's psychological evaluation, and jail records. Dr. Gilgun noted the following with respect to the Jail infirmary records:

Review of the records indicates that he was first admitted to the infirmary on 5/21/2010 with suicidal ideation. At that time, he denied hallucinations. He reports that he wasn't interested in mental health treatment or services. It was judged that the suicide risk was low. Since that time I have counted at least ten occasions where he has been placed on suicide watch with the behaviors being very similar. He would report that he was suicidal, be placed on suicide watch for a brief period of time, and then return to the general population. In August of 2010, he began reporting auditory hallucinations, which he told the mental health staff, were instructing him hurt [sic] himself. The staff has judged that he is exaggerating his symptoms and being manipulative. For instance, there have been several occasions where he has denied hallucinations, only to report them a short time later. He has been placed in a restraint chair and that seems to get him to want to be away from the infirmary and back to the general population. There have been occasions where it is believed that he has manipulated placement in the infirmary to be near his girlfriend, who is pregnant with his child. The conclusion of the treating mental health staff is that the defendant has been manipulative and not seriously mentally ill.

(Ex. F).

With respect to Dr. Larson's evaluation, Dr. Gilgun commented:

The prior evaluation by Dr. Larson indicated that he felt the defendant was malingering, and indeed, malingering testing indicated that he was indeed feigning impairment. Of utmost importance is that Dr. Larson evaluated him on March 5, 2009, at which point he gave Dr. Larson satisfactory answers to the competency questions and was judged by Dr. Larson to be competent to proceed. There was a significant reversal of this when Dr. Larson saw him in July 2010 with the defendant claiming to know virtually nothing about the adversarial process and giving very inadequate definitions of the roles and duties of the judge, jury, and state attorney. There was a drastic contrast in the results that Dr. Larson found in March 2009 to those found in July of 2010 with no clear-cut

explanation of why the defendant had undergone such a drastic deterioration in functioning.

(Ex. F).

Dr. Gilgun noted the following with respect to his observations of Petitioner's

behavior and mental status:

> On the two occasions that I met with him I felt that he was very uncooperative, and as a matter of fact, confronted him about this. This had very little impact on his overall behavior. There were numerous signs that he was exaggerating his deficits, and for instance, on occasions he could be very "with it" and on other occasions, claimed to be very confused. As a matter of fact, there were periods where he would just sit and stare and refuse to answer my questions. I would like to emphasize that I believe that all of this was under his control and I tried my best to get him to be cooperative since I felt that was in his best interest. Unfortunately, I was not able to get him to cooperate and I felt that he put forth a very poor effort throughout the interview and the testing.

> Mental status examination reveals a man who is oriented as to time, place, person, and circumstance. He claims to have terrible memory for both recent and remote events. His thought processes appear to be fairly well organized and goal directed today. However, he complains of hallucinations that tell him to harm himself. Quite frankly, I believe that these hallucinations are feigned. From what he related concerning his life, I would describe his insight and judgment as poor. His life history points to the fact that he has been very self-defeating. His affect today was flat with restriction of range of affect.

(Ex. F).

Petitioner was administered the TOMM and intelligence testing (*see* Ex. F). Dr.

Gilgun noted:

Mr. Henderson scored poorly on the TOMM, once again indicating that he was feigning memory impairment. His performance was clearly in the malingering range. I even confronted the defendant about these results, telling him that it was not in his best interest to continue to "fake" and that he should be straightforward. I was particularly interested in results from intelligence testing, since the records indicate that he was in ESE classes and most likely did have some intellectual deficits. Unfortunately the defendant did not respond to my encouragement to be "straight up", and he again, malingered on the intelligence testing and it was clear that he was not putting forth his best effort. Results from intelligence would indicate that the defendant is functioning in the moderately mentally retarded range with a Full Scale IQ of 53. Quite frankly, that result is not believable and during the few times where he was willing to talk with me, the defendant showed evidence of vocabulary skills and general thinking abilities that are well above what one would expect from a moderately retarded individual.

(Ex. F).

On the issue of Petitioner's competence, Dr. Gilgun opined:

Evaluating the defendant was a frustrating experience for both him and me. I tried to get across the point that I felt that he did have some deficits and that if he was "straight up" that I would be able to evaluate those deficits which might be helpful in providing the Court with mitigating circumstances at the time of sentencing. The defendant pure and simple did not "buy any of this" and continued to be totally uncooperative. From the data available to me, it does not appear that the defendant suffers from a bonafide psychiatric illness. I see him as suffering from a well-entrenched antisocial personality disorder and chemical dependency. I believe there is mostly likely some degree of intellectual limitations but not near to what he presented during the intelligence testing. I would estimate that the defendant's actual level of intellectual functioning is probably in the borderline mentally defective range. I do not believe that the defendant is psychotic and believe that his symptom presentation is grossly exaggerated for self-serving reasons.

Specifically, I believe there are times when he wants to appear disturbed in the hope that it will help him with his case.

The defendant's behavior with me, as well as with Dr. Larson, is in my opinion extremely self-defeating. Specifically, I believe that the defendant does have some genuine problems, and for instance, I would estimate that he is most likely functioning in the borderline mentally defective range and may have a poor appreciation of factual matters regarding legal proceedings. It also appears that the defendant does have at least some difficulties with depression related to the stress of incarceration and the very serious charges that he is facing. There are numerous indications that he is exaggerating his problems but I don't believe that it is logical to conclude that because he is exaggerating that be doesn't have any problems at all. Therefore, it is my opinion that in his current very disturbed state that he is not competent to proceed, chiefly related to being in a very poor shape psychologically and making numerous self-injurious actions. The way that the defendant is behaving it appears clear that he is lacks sufficient present ability to relate to his attorney with a reasonable degree of rational understanding. He certainly would not be able to manifest appropriate courtroom behavior or to testify relevantly in his own behalf. All of this can be self-serving and his actions may be manipulative to avoid punitive consequences for his behavior. However, since he has such serious charges I believe the most judicious course of action would be to have the defendant further evaluated at the Forensic Unit at the Florida State Hospital in Chattahoochee. This would provide an "around the clock" opportunity for the defendant to be observed by trained mental health professionals. He also could be offered treatment to see if his depressive symptoms and hallucinations yield to such treatment. In my opinion, he does meet the criteria set forth in law for involuntary hospitalization. Specifically, he suffers from some form of mental illness that renders him likely to injure himself as his actions have demonstrated. He has been involved in a great deal of self-injurious behavior, and in my opinion, his status should be evaluated by placing him in a psychiatric facility to better evaluate his circumstances.

(Ex. F).

The trial court held a competency hearing on March 21, 2011, and the transcript of that hearing was part of the state court record on direct appeal (*see* Ex. N at 660–83). Dr. Larson was not available to testify due to illness, but the court reviewed his report (*id.* at 661–62). The State presented testimony of Anita Hemphill, the administrator of the Escambia County jail ("Jail") (*id.* at 664–69). Commander Hemphill testified she became familiar with Petitioner because she received numerous reports regarding his disruptive behavior (*id.* at 665). Commander Hemphill testified that Petitioner consumed a lot of jail staff's time (*id.* at 666). She testified that administrators spent a lot of time writing reports, and correctional officers spent a lot of time responding to Petitioner's behavior by "dealing with him physically," placing him in a restraint chair, and responding to his flooding his cell, destroying county property, and violating institutional rules (*id.*). Commander Hemphill testified that she made a point to personally visit with disruptive inmates, so she personally spoke with Petitioner (*id.* at 665–66). Commander Hemphill testified she and Petitioner discussed the competency process, including what would happen if the court committed him to the state hospital in Chattahoochee (*id*. at 666–68). Commander Hemphill described their conversation as follows:

Q (By Mr. Luongo [the prosecutor]).  And do you— now, was the conversations [sic] that you had with the defendant, do you remember specific statements he made about going to Chattahoochee and what did he say?

A.  The last time before last [sic], I spoke to Mr. Henderson, personally.  He apologized and he told me that, with all respect to you, Commander Hemphill and your officers, I don't mean y'all any harm, but I've got to do what I have to do so I can go to where I need to go, which was Chattahoochee.

Q.  And you said you explained the process of Chattahoochee to him?

A. Yes.  He told me that he was going to get out of jail and he was facing time.  And the way that that would happen was that he would go to—be found incompetent, go to Chattahoochee, and then be released.  And I asked him to be more realistic and understood [sic] that that was not how the process—I really wanted to him to understand that he was led to believe something that wasn't really true.

Q.  And after you explained it, or at least your impressions of that process, the Chattahoochee process, did his behavior change?

A.  Temporarily; a couple of days.

Q.  How so?

A.  He behaved.  I have done some behavioral modifications for Mr. Courtney Henderson by way of trying to modify his behavior to good behavior by making particular deals with him.

(Ex. N at 667–68).

The State also presented Dr. Gilgun's testimony.  Dr. Gilgun testified consistently with his report (Ex. N at 671–75).  Dr. Gilgun explained his finding of incompetency as follows:

> This was—this is a tough thing.  The man was in and out of suicide watch and he was cutting on himself.  So, even though I found that he wasn't putting forth a good effort to answer the questions, it's rather unusual for a defendant, in my experience, to have ten suicide watches.
>
> So, even though the jail said that he was manipulative, each time they would put him on suicide watch, and they'd put him in a restraint chair, so—and my feeling is that here's a man that's, you know, really out of control and he had serious charges that he should probably be treated for awhile, even though I didn't think they were as serious as he portrayed them to be.  He was cutting on himself and in a suicide chair.

(Ex. N at 675).  Dr. Gilgun testified that Commander Hemphill's testimony did not totally change his opinion, it simply convinced him that Petitioner's actions (i.e., appearing "crazy" so he did not have to face the legal consequences) were self-serving (*id.* at 676–77).

At the conclusion of the competency hearing, the court made the following findings:

> [T]he issue of competence to proceed to trial is not simply an issue of whether or not there is any mental illness.  It's whether or not, as a result of that mental illness, the defendant is not competent to proceed to trial.

So, I'm not going to make a determination on the issue of whether or not there's any mental illness.  But, on the issue of whether or not there's been a showing that he's not competent to proceed to trial, I'm satisfied that he's trying to avoid trial by essentially faking it.

And based on the testimony I've heard, I'm satisfied there's been no showing that he's not competent to proceed to trial.

(Ex. N at 679–80).[5]

Petitioner has not shown, by clear and convincing evidence, that the state court's competency finding was not fairly supported by the record.   Dr. Larson determined that Petitioner was able to master Competency Instructional Training materials when Larson first evaluated him in 2009, and "it is more likely than not" Petitioner was competent at the of his subsequent evaluation in 2010, as Petitioner's performance during the latter evaluation was malingered.  Dr. Larson further opined that Petitioner had a rational, as well as a factual, understanding of the proceedings against him.  Dr. Gilgun was of the opinion that Petitioner was incompetent, but this was largely based upon the seriousness of Petitioner's criminal charge and Petitioner's "out of control" behavior at the jail, which Dr. Gilgun believed warranted professional observation and treatment.

---

[5] This was the first, and only, competency determination in Petitioner's case.

The record fairly supports the state court's finding that Petitioner was competent to proceed; therefore, this federal habeas court must defer to that finding. *See* Turner, 339 F.3d at 1273. Petitioner has not demonstrated that the First DCA's adjudication of his claim of trial court error (i.e., that the trial court erred by finding him competent to proceed), was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of clearly established federal law. Petitioner is thus not entitled to federal habeas relief on Ground One.

    B.   <u>Ground Two: "Whether the court should have excluded the testimony of jail supervisor Hemphill based on her custodial interrogation of the Petitioner when he was represented by counsel."</u>

Petitioner contends the trial court erred by admitting the testimony of Anita Hemphill at the competency hearing (ECF No. 1 at 7–8). Petitioner alleges Commander Hemphill's questioning him about his disruptive behavior at the jail constituted a custodial interrogation (*id.*). Petitioner contends Commander Hemphill initiated the interrogation after Petitioner had invoked his <u>Miranda</u> rights by accepting appointment of counsel (*id.*). Petitioner asserts he presented this claim to the state courts on direct appeal (*id.* at 9).

Respondent concedes Petitioner presented this claim of trial court error as Issue II on direct appeal (*see* ECF No. 22 at 23–24). Respondent asserts the State argued

in its answer brief that the claim was barred from appellate review because it was not preserved below; and the State alternatively addressed the claim on the merits (*id.* at 24–25).   Respondent asserts the First DCA affirmed the judgment of conviction without written opinion (*id.* at 25).   Respondent contends the most likely explanation for the First DCA's decision is that it found Petitioner's claim to be barred from review on appeal because it was not preserved (*id.*).   Respondent argues that the likelihood the First DCA applied a state procedural bar overcomes the presumption that the state court adjudicated the claim on the merits; and the federal habeas court must honor the First DCA's procedural ruling (*id.* at 25–26).   Respondent contends Ground Two is thus unexhausted and procedurally defaulted (*id.* at 26–29).   Respondent contends Petitioner has not overcome the procedural bar by satisfying either the "cause and prejudice" standard or the "fundamental miscarriage of justice" exception to the procedural bar; therefore, he is not entitled to federal review of Ground Two (*id.*).

The court rejects Respondent's procedural bar argument.   Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits."   *See* <u>Richter</u>, 562 U.S. at 99.   When a state court issues an order that summarily rejects without discussion all the claims raised by a

defendant, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary. *Id.* The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely. *Id.* at 99–100.

As Respondent notes, in the State's answer brief on direct appeal, the State argued that Petitioner failed to preserve the issue, <u>and</u> that the issue was without merit (*see* Ex. Q at 3, 7–9). The First DCA did not clearly and expressly state it was relying on a state procedural rule to resolve Petitioner's federal claim—the First DCA simply rejected it without stating its reasons for doing so. Respondent has not overcome the presumption that the First DCA's unreasoned rejection of Petitioner's claim of trial court error was an adjudication on the merits. *Cf.* <u>Gillett v. Crews</u>, No. 3:12cv445/LAC/CJK, 2014 WL 3720955, at *13 (N.D. Fla. July 28, 2014) (unpublished) (State overcame the presumption that the First DCA's unreasoned rejection of the petitioner's claim of trial court error was an adjudication on the merits where the State's answer brief on direct appeal declined to address the merits of the petitioner's federal claim and responded solely on two independent procedural bases, that petitioner did not timely preserve the issue for appellate review and that

petitioner's claim was barred by principles of waiver and estoppel). Because Respondent has not overcome the presumption that the First DCA's unreasoned rejection of Petitioner's claim of trial court error was an adjudication on the merits, the court will determine whether the First DCA's rejection of Petitioner's claim was contrary to or an unreasonable application of clearly established federal law.

In making this determination, it is important to clarify the nature of the federal claim presented to the First DCA. On direct appeal, Petitioner's counsel argued that Petitioner's statements to Commander Hemphill arose from a custodial interrogation (Ex. P at 24–26). Petitioner argued that the public defender's office was appointed to represent him at his first appearance, which occurred prior to Commander Hemphill's questioning, and that by Petitioner's accepting the appointment of counsel, he invoked his Fifth Amendment right to counsel under <u>Miranda</u> (*id.*). Petitioner argued that he did not waive his Fifth Amendment right to counsel, because he did not initiate the contact with Commander Hemphill (*id.*). Petitioner argued that the Fifth Amendment prohibited Commander Hemphill from questioning him regarding any other offense, e.g., flooding his cells and destroying county property, without counsel present (*id.*). Petitioner did <u>not</u> argue a violation of his Sixth Amendment right to counsel (*see id.*).

Therefore, the court will use the Supreme Court's holdings on the Fifth Amendment issue as the "clearly established Federal law" for purposes of § 2254(d)(1).

       1.     Clearly Established Federal Law

In Miranda, the United States Supreme Court ruled that statements made by an individual while under custodial interrogation may not be introduced as evidence against the individual unless he or she first has been informed of certain rights, including the right to have counsel present during custodial interrogation. 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). These rights, commonly known as Miranda rights, are designed to protect an individual's Fifth Amendment right against compelled self-incrimination by offsetting the "inherently compelling pressures" of custodial interrogation. *Id.*, 384 U.S. at 467. Under Miranda, if an individual indicates he or she wishes to consult an attorney, police must cease interrogation until after an attorney is made available. *Id.* at 445.

Subsequent Supreme Court cases have added to the original safeguards set out in Miranda. For example, the Court made clear in Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), that once an individual has invoked the Miranda right to counsel, a valid waiver of this right can be found only if the individual is the one responsible for reinitiating contact with the police. *Id.*, 451 U.S.

at 484–85.  The Court further ruled in <u>Arizona v. Roberson</u>, 486 U.S. 675, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988), that the "Fifth Amendment" right to counsel under <u>Miranda</u> is not offense-specific; that is, once an individual invokes the right to counsel for interrogation with respect to one offense, the police may not question the individual regarding any offense unless an attorney is present.  *Id.* at 677.

In <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991), the Supreme Court held that an accused's request for counsel at his initial appearance on a charged offense, while effective to invoke his Sixth Amendment right to counsel, did not constitute an invocation of his <u>Miranda</u> right to counsel that would preclude police interrogation on unrelated, uncharged offenses under <u>Edwards</u>. *See* <u>McNeil</u>, 501 U.S. at 177–78.  In so holding, the Court refused to merge the Sixth Amendment right to counsel, which is offense-specific, with the non-offense-specific <u>Miranda</u> right to counsel during interrogation.[6]

## 2.    Federal Review of State Court Decision

The First DCA's rejection of Petitioner's federal claim (i.e., that the trial court's admission of Commander Hemphill's testimony regarding Petitioner's statements

---

[6] The Supreme Court has expressly distinguished the Fifth Amendment custodial-interrogation standard from the "deliberate-elicitation" standard applicable in Sixth Amendment cases.  *See* <u>Fellers v. United States</u>, 540 U.S. 519, 524, 124 S. Ct. 1019, 157 L. Ed. 2d 1016 (2004) (citations omitted).

explaining his disruptive conduct at the jail violated Petitioner's Fifth Amendment right to counsel) could have been based upon the theory that Petitioner had not shown he had invoked the <u>Miranda</u> right to counsel, with respect to his uncharged disruptive conduct at the jail, at the time Commander Hemphill questioned him about his disruptive conduct. The only fact upon which Petitioner relied for his argument that he invoked his <u>Miranda</u> rights was the fact that during his first appearance on the robbery and aggravated battery charges, on April 9, 2010, the public defender's office was appointed to his case (*see* Ex. P at 25). Under Supreme Court precedent, this did not constitute an invocation of his <u>Miranda</u> right to counsel that would preclude police interrogation on unrelated, uncharged offenses under <u>Edwards</u>. *See* <u>McNeil</u>, 501 U.S. at 177–78.

Petitioner has failed to demonstrate that the state court's adjudication of his Fifth Amendment claim was contrary to or an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

C.    <u>Ground Three: "Whether it was error for the court to find that the Petitioner was qualified to represent himself."</u>

Petitioner contends the trial court erred by deeming him qualified to represent himself (ECF No. 1 at 9–10). Petitioner alleges Dr. Gilgun determined he was

"borderline retarded," and his psychological history documented his mental health issues (*id.*). Petitioner contends the trial court conducted a <u>Faretta</u>[7] hearing without reviewing his mental health records, thoroughly investigating his current mental state, or assessing his ability to consult with his attorney on a rational level (*id.* at 10).

Respondent appears to concede Petitioner exhausted this claim by presenting it as Issue III on direct appeal (ECF No. 22 at 29–30). Respondent contends the First DCA adjudicated the merits of the claim (*id.* at 30–31). Respondent contends Petitioner has failed to demonstrate that the First DCA's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law, or that the adjudication rested upon an unreasonable determination of the facts (*id.* at 31–34).

### 1.    Clearly Established Federal Law

"The Sixth and Fourteenth Amendments of [the] Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." <u>Faretta v. California</u>, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *see also* <u>Iowa v. Tovar</u>, 541 U.S. 77, 80–81, 124 S. Ct. 1379, 158 L. Ed. 2d 209 (2004). The Sixth Amendment, however, also includes the right to

---

[7] <u>Faretta v. California</u>, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

self-representation.  *See* Faretta, 422 U.S. at 831–32, 836.  In order to exercise the right to self-representation, the defendant must "knowingly and intelligently" waive his right to counsel.  *Id.* at 835.

The Supreme Court has held that, "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open."  Faretta, 422 U.S. at 835 (internal quotations and citation omitted); *see also* Patterson v. Illinois, 487 U.S. 285, 298, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988).  The Supreme Court has not, however, "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel."  Faretta, 422 U.S. at 835.  Thus, "the failure to provide on-the-record warnings does not always lead to reversal," because "the ultimate test of whether a defendant's choice is knowing is not the adequacy of the trial court's warning but the defendant's understanding."  Jones v. Walker, 540 F.3d 1277, 1293 (11th Cir. 2008) (en banc) (internal quotation marks omitted).  The information a defendant must possess to make a knowing and intelligent waiver "will depend on a range of case-specific factors."  Iowa v. Tovar, 541 U.S. 77, 88, 124 S. ct. 1379, 158

L. Ed. 2d 209 (2004).   However, the "core inquiry is whether the defendant understood the choices before him" and the risks of self-representation.  <u>Jones</u>, 540 F.3d at 1293.  Moreover, "it is irrelevant for constitutional purposes whether his understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience." *Id.*

The Supreme Court also recognized that a defendant's right to represent himself, if he voluntarily elects to do so, "does not encompass the right to choose any advocate if the defendant wishes to be represented by counsel." *See* <u>Wheat v. United States</u>, 486 U.S. 153, 159 n.3, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as Issue III on direct appeal (Ex. P at 26–27). Petitioner argued that the trial court's finding, that he knowingly and intelligently waived his right to counsel, was not predicated on all the relevant evidence to determine whether the waiver was knowing or intelligent, because the trial court did not review Dr. Larson's report (*id.*).   The First DCA affirmed the judgment of conviction without written opinion (Ex. S).

As discussed *supra* in Ground One, in Dr. Larson's report reflects that, with respect to Petitioner's competency to proceed, Dr. Larson opined, "If the Defendant

is to be believed, he did not know the meaning of burglary. However, he has a general

understanding of why he was arrested and realizes be can receive prison time if

convicted. He has a rational, as well as a factual, understanding of the proceedings

against him." (Ex. E). Dr. Larson made the following recommendations:

> While the Defendant has a history of mental health problems and Mental
> Retardation, he has previously been able to master Competency
> Instructional Training materials. I concluded that today he was only
> superficially cooperative with the evaluation and was malingering or
> grossly exaggerating his deficits. By inference, since I have evaluated
> him when he was clearly competent to proceed, I concluded that it is
> more likely than not he continues to remain competent as he proceeds at
> this time, as his performance today is malingered. (I cannot totally rule
> out memory decay of previously learned items, but given gross
> malingering, it is more reasonable to conclude he continues to have an
> adequate understanding of the nature of the adversarial process.)

> I also found he was quite passive-aggressive today. He is a difficult
> client for you to deal with. However, I think this is a function of a
> Personality Disorder and the fact that he is angry about being
> incarcerated and is not adjusting well to incarceration.

> My recommendation is that you attempt to work with him as if he is
> competent. Should you become convinced that he is not competent, a
> reevaluation may be in order. Although we could not obtain valid IQ
> scores today, he does have childhood IQ scores placing him in the
> Mentally Retarded range.

> The remedy, should this occur [i.e., defense counsel's becoming
> convinced that Petitioner was not competent], would be to place him in
> Competency Instructional Training classes, or, alternatively, commit him
> to the Agency for Persons With Disabilities, where he could go through

a program such as Florida State Hospital's Mentally Retarded Defendant's Program.

(Ex. E) (emphasis added).

The state court record reflects that on July 21, 2011, the trial court held a hearing on Petitioner's letter from Petitioner to the court requesting that the court remove the public defender's office from his case and appoint different counsel (Ex. N at 609–59).[8] When the hearing commenced, the court advised Petitioner that the court would hear Petitioner's complaints regarding the public defender's representation, and determine whether the public defender's office had failed to adequately represent him (*id.* at 611). The court advised Petitioner that if the court determined that the public defender's office had not properly represented him, the court would appoint another attorney to represent him; but if the court determined that the public defender's office had properly represented him, Petitioner would be

---

[8] Florida courts refer to this hearing as a Nelson hearing. Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973) (holding that where defendant, before commencement of trial, requests discharge of his court-appointed counsel, trial judge should make an inquiry of defendant as to reason for request and, if incompetency of counsel is assigned as reason, should make a sufficient inquiry of defendant and his appointed counsel to determine whether there is cause to believe that counsel is not rendering effective assistance to defendant, and if reasonable cause for such belief appears, trial judge should make a finding to that effect on record and appoint substitute counsel who should be allowed adequate time to prepare defense, but if no reasonable basis for such belief appears, trial judge should so state on record and advise defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute).

required to decide whether he wished to represent himself or whether he wished to have the public defender's office to remain on his case (*id.*).

Petitioner informed the court, under oath and in a coherent and rational manner, of the reasons he believed the public defender's office had failed to properly represent him, including, that his assigned public defender, Assistant Public Defender ("APD") Henderson (1) failed to request a hearing to determine whether the State disclosed all of the evidence against Petitioner, (2) failed to communicate with Petitioner about the progress of his case, and Petitioner only became aware of activity in his case by attending court appearances, (3) communicated certain information to the prosecutor (for example, that the defense intended to request a continuance) before he communicated it to Petitioner, (4) exhibited a "belligerent" attitude when Petitioner attempted to discuss matters concerning his case, and (5) seemed to be too friendly with the prosecutor (Ex. N at 612–22). The court questioned APD Henderson regarding each of Petitioner's complaints (*id.* at 622–29). The court found that Petitioner did not demonstrate that the public defender's office had rendered ineffective assistance (*id.* at 637). Upon APD Henderson's announcing that a different public defender, APD Bradley Rowe, would be handling Petitioner's trial, the court inquired of Petitioner whether he still wished to discharge the public

defender's office and represent himself, or whether he wished for the public defender's office to continue its representation (*id.* at 638).  Petitioner responded, "I'd rather represent myself, Your Honor." (*id.*).

The court then conducted a <u>Faretta</u> inquiry (Ex. N at 638–54).  The court first verified that Petitioner was found competent to proceed, and had not previously been found incompetent (*id.*).  The court also determined Petitioner's age, educational level, medications, legal training, previous experience representing himself, and understanding of the maximum penalty he faced (*id.*).  The court ascertained that Petitioner understood that if he chose to represent himself, he would lose the following advantages (1)  having a person educated and trained in the law represent him, (2) having a person trained in the court rules, including the rules of evidence and trial procedure, ensure that legal procedures were followed and that appropriate and timely objections were made so that issues were preserved for appeal, (3) providing Petitioner "two different shots at a jury deciding that somebody on your side is credible," as opposed to Petitioner's credibility hinging entirely upon the jury's assessment of only Petitioner's credibility, (4) a more effective presentation of his own testimony, if he chose to testify, (5) a "cool-headed," professional presentation of Petitioner's case, as opposed to a presentation driven by emotional involvement (6)

greater access to communication with the prosecutor, (7) ease in conducting discovery, and (8) an understanding of sentence enhancement issues (*id.*). The court ascertained that Petitioner understood he would be required to abide by the same court rules that attorneys were required to follow, and that the court would not "coach" him or assist him in presenting his case (*id.*). The court also determined that no one had tried to "talk him out of" having an attorney represent him, or suggested that he should not have an attorney represent him (*id.*). At the conclusion of the court's inquiry, the court found that Petitioner was "alert and intelligent," and "though it may be an ill-advised decision, he's competent to make the decision to represent himself" (*id.* at 654). Additionally, the trial court appointed the public defender's office as standby counsel (*id.* at 654–55).

On August 4, 2011, two weeks after the <u>Nelson</u> and <u>Faretta</u> hearings, the court held an additional hearing to determine if Petitioner desired, and qualified for, substitute counsel based upon the court's receipt of another letter from Petitioner asserting an additional reason for his contention that the public defender's office was ineffective in its representation (this is the basis of the ineffective assistance of trial counsel claim asserted *infra* as Ground Four of Petitioner's § 2254 petition) (Ex. H). The court took testimony from APD Henderson, APD Rowe, and APD Katina Hardy,

all of whom had participated in representing Petitioner (*id.*). The court heard Petitioner's testimony and arguments, and allowed Petitioner to question the Assistant Public Defenders (*id.*). The trial court reaffirmed its previous decision that the Public Defender's Office had not been ineffective in its representation, thus there was no reason to appoint substitute counsel (*id.* at 24–25). APD Henderson made a motion that the Public Defender's Office be removed as standby counsel due to the conflict between Petitioner and the Public Defender's Office (*id.* at 27). The court took the matter under advisement (*id.*).

Jury selection commenced four days later, on August 8, 2011 (*see* Ex. O). The court announced that it had considered the issue of whether there was such a conflict that an attorney other than the Public Defender's Office should be available as standby counsel, and concluded that there was not, so the Public Defender's Office would remain as standby counsel available to Petitioner (*id.* at 698). Since jury selection was a "critical stage" of the criminal proceedings, the court inquired whether Petitioner still wished to represent himself, and Petitioner initially insisted he did (*id.* at 700–01). The court conducted another <u>Faretta</u> inquiry, during which the court again reviewed the advantages of having an attorney represent him, and the disadvantages of self-representation (*id.* at 701–07). The court again ascertained that Petitioner was 24

years old, had completed education until the 11th grade, was able to read and write, had not consumed any medication within the past 24 hours, had never been diagnosed with any mental illness, and had never represented himself in a trial (*id.* at 707–08). The court also ascertained that no one had told Petitioner that he should not have an attorney represent him (*id.* at 708). Just prior to the jury venire's presence in the courtroom, Petitioner announced he wished to have APD Rowe represent him throughout jury selection and the jury trial (*id.* at 725). The court reappointed the Public Defender's Office, and APD Rowe represented Petitioner during the remainder of the trial proceedings (*see* Ex. O at 726–29, Exs. I1, I2).

In rejecting Petitioner's claim of trial court error with respect to the trial court's finding that he was qualified to represent himself, the First DCA could have reasonably concluded that the trial court made Petitioner aware of the dangers and disadvantages of self-representation, and that Petitioner knew what he was doing and made the choice to represent himself "with eyes open." The First DCA also could have rejected Petitioner's claim on the ground that Petitioner failed to show that his representing himself during the two-week period from July 21, 2011 to August 8, 2011, had any harmful effect on the criminal proceedings.

Petitioner has failed to demonstrate that the First DCA's adjudication of Ground Three was contrary to or an unreasonable application of <u>Faretta</u>. Therefore, he is not entitled to federal habeas relief on Ground Three.

> D.    <u>Ground Four:  "Whether Mr. Henderson's attorneys were ineffective based on their not determining if the Petitioner's witness knew him by his alias."</u>

Petitioner alleges APD Rowe was ineffective with respect to his investigation of Tracci Ruff as an alibi witness (ECF No. 1 at 11–12; ECF No. 24 at 8–9). Petitioner alleges in June of 2011, two months prior to trial, he told APD Rowe that at the time the crimes were committed, he and his cousin were at Ms. Ruff's home (*id.*). Petitioner alleges APD Rowe did not tell him that Ms. Ruff stated she did not know a man named Courtney Henderson, and if APD Rowe had mentioned this, Petitioner would have told Rowe that Ms. Ruff may have only known him by his "nickname" (*id.*). Petitioner alleges APD Rowe had a copy of the arrest report, which listed his alias as Courtney Foshee (*id.*). Petitioner alleges if APD Rowe had mentioned Petitioner's alias to Ms. Ruff or provided his physical description when he interviewed her, she "would have remembered and would have been able to testify" (*id.*). Petitioner asserts he presented this issue on direct appeal (ECF No. 1 at 12).

Respondent asserts an exhaustion defense to Ground Four.  Respondent argues

Ground Four is a combination of an ineffective assistance of trial counsel ("IATC")

claim presented by Petitioner as Issue IV on direct appeal, and an IATC claim

presented by Petitioner in his Amended Rule 3.850 motion (ECF No. 22 at 34–36).

Respondent contends the First DCA did not adjudicate the merits of the claim on

direct appeal, within the meaning of § 2254(d), because the First DCA affirmed the

conviction without written opinion, thus necessarily determining that the issue was

premature and required evidence beyond the appellate record (*id.* at 36–37 (citing

Corzo v. State, 806 So. 2d 642, 645 (Fla. 2d DCA 2002) ("Because of the strict rules

limiting claims for ineffective assistance of counsel on direct appeal, the appellate

courts typically reject the issue as both premature and requiring evidence beyond the

appellate record.  Accordingly, unless a direct appeal is affirmed with a written

opinion that expressly addresses the issue of ineffective assistance of counsel, an

affirmance on direct appeal should rarely, if ever, be treated as a procedural bar to a

claim for ineffective assistance of counsel on a postconviction motion.") (citations

omitted)).  Respondent contends the First DCA's decision on direct appeal thus did

not preclude Petitioner from presenting the IATC claim in a Rule 3.850 motion;

further, Petitioner did, in fact, present this IATC claim as Ground Two of his

Amended Rule 3.850 motion (*id.* at 39–44).  Respondent contends the state circuit court adjudicated the merits of the post-conviction claim, as evidenced in its written decision denying the Amended Rule 3.850 motion; however, Petitioner did not appeal the circuit court's decision and thus procedurally defaulted the IATC claim for purposes of federal habeas (*id.* at 39–41).  Respondent contends notwithstanding Petitioner's failure to satisfy the exhaustion requirement, Ground Four is without merit (*id.* at 41–44).

Petitioner did not address Respondent's exhaustion argument in his reply (*see* ECF No. 24 at 8–9).

The undersigned agrees with Respondent, that Petitioner has not satisfied the exhaustion requirement as to Ground Four.  With respect to Petitioner's direct appeal, because the First DCA did not affirm with a written opinion that expressly addressed the IATC issue, the affirmance could not have presented a procedural bar to Petitioner's presenting the IATC claim in a Rule 3.850 motion.  *See* Corzo, 806 So. 2d at 645.  Because the affirmance on direct appeal did not bar Petitioner from pursing the IATC claim in a Rule 3.850 motion, Petitioner could not have satisfied the federal exhaustion requirement by stopping there.  *See, e.g.*, Lock v. Sec'y, Dep't of Corr., No. 1:07cv00144/MMP/GRJ, 2011 WL 3611408, at *4–5 (N.D. Fla. June 15, 2011)

(holding that three of the IATC claims presented in petitioner's § 2254 petition were unexhausted, despite petitioner's presenting them to the First DCA on direct appeal, because the First DCA affirmed the conviction without written opinion, and petitioner did not present the three particular IATC claims in his Rule 3.850 motion (citing Corzo, 806 So. 2d at 645)), *Report and Recommendation Adopted by* 2011 WL 3611398, at *1 (N.D. Fla. Aug. 17, 2011) (unpublished but recognized as persuasive authority).

Further, although Petitioner did not stop there, and he did present the IATC claim as Ground Two of his Rule 3.850 motion (*see* Ex. EE at 5–10), Petitioner did not complete one full round of state post-conviction review, because he did not appeal the denial of the Rule 3.850 motion to the First DCA.  The state circuit court rendered its decision on July 19, 2016 (*see* Ex. JJ at 1–6), and the circuit court denied Petitioner's motion for rehearing on January 18, 2017 (*see* Ex. MM).  Petitioner did not appeal the circuit court's order, as was available to him pursuant to Rule 9.141(b)(3).  Additionally, the deadline for Petitioner to file a petition for belated

appeal has expired.[9]  Therefore, Petitioner procedurally defaulted the IATC claim presented in Ground Four.

Petitioner has not alleged cause for the procedural default, nor has he alleged the existence of new, reliable evidence of his factual innocence of the robbery and battery convictions.  Therefore, Petitioner is not entitled to federal review of the merits of Ground Four.

## V.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v.

---

[9] Petitioner had 2 years from the expiration of time for filing the notice of appeal from the circuit court's final order in which to file a petition for belated appeal.  *See* Fla. R. App. P. 9.141(c)(5)(A).  The circuit court's final order issued on January 18, 2017 (*see* Ex. MM), thus Petitioner had 30 days, or until February 17, 2017, to file a notice of appeal.  Two years from that date was February 17, 2019.

Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" Buck v. Davis, 580 U.S.—, 137 S. Ct. 759, 773 (2017) (citing Miller-El, 537 U.S. at 327). Here, Petitioner cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to substitute Mark S. Inch for Julie Jones as Respondent.

And it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>1</u><sup>st</sup> day of April 2019.


<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**